IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | |
| ) | Chapter 11 |
| DURA AUTOMOTIVE SYSTEMS, INC., et al., ) | |
| ) | Bank. No. 06-11202 (KJC) |
| Reorganized Debtors. ) | Jointly Administered |
| ) | |
| ATWOOD MOBILE PRODUCTS, LLC, ) | |
| ) | |
| Appellant, ) | |
| ) | Civ. No. 09-69-SLR |
| v. ) | |
| ) | |
| DURA AUTOMOTIVE SYSTEMS, INC., et al., ) | |
| ) | |
| Appellees. ) | |

**MEMORANDUM ORDER**

At Wilmington this 19th day of January, 2010, having reviewed the papers submitted in connection with the above captioned appeal;

IT IS ORDERED that the appeal is denied and the December 30, 2008 decision of the bankruptcy court is affirmed, for the reasons that follow:

1. **Standard of Review.** This court has jurisdiction to hear an appeal from the bankruptcy court pursuant to 28 U.S.C. § 158(a). In undertaking a review of the issues on appeal, the court applies a clearly erroneous standard to the bankruptcy court's findings of fact and a plenary standard to that court's legal conclusions. *See Am. Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir. 1999). With

mixed questions of law and fact, the court must accept the bankruptcy court's "finding of historical or narrative facts unless clearly erroneous, but exercise[s] 'plenary review of the [bankruptcy] court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.'" *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 642 (3d Cir. 1991) (citing *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 101-02 (3d Cir. 1981)). The district court's appellate responsibilities are further informed by the directive of the United States Court of Appeals for the Third Circuit, which effectively reviews on a de novo basis bankruptcy court opinions. *See In re Hechinger*, 298 F.3d 219, 224 (3d Cir. 2002); *In re Telegroup*, 281 F.3d 133, 136 (3d Cir. 2002).

2. In the Third Circuit, the bankruptcy court's interpretation of its own sale order is "subject to review for an abuse of discretion." *In re Shenango Group Inc.*, 501 F.3d 338, 346 (3d Cir. 2007). While the bankruptcy court's interpretation of its sale order's ambiguity is reviewed de novo, if ambiguity is found, then the bankruptcy court's interpretation will be deferred to "unless it is unreasonable under the circumstances." *Id.*

3. **Background.**[1] On October 30, 2006 (the "Petition Date"), Dura Automotive Systems, Inc. and related entities (collectively, "Dura" or "debtors") filed chapter 11 bankruptcy petitions. (D.I. 12 at 375) As of the Petition Date, Allied Motion-Motor Products, Inc. ("Allied") and Dura's Atwood Division ("Old Atwood") were parties to a Consigned Stock Agreement (the "CSA"). (*Id.* at 376) In March of 2007, the

---

[1]The facts set forth in this background section, taken largely from the bankruptcy court's statement of facts (D.I. 12 at 376), are not in dispute.

2

bankruptcy court approved Dura's assumption of the CSA. (*Id.*) Dura later entered into an Asset Purchase Agreement (the "APA") with appellant Atwood Mobile Products LLC ("appellant") to sell appellant substantially all of the assets of Old Atwood. (*Id.*) The sale included assumed contracts, such as the CSA. (*Id.*) Section 7.6 of the APA, entitled "Assignment of Contracts," states:[2]

> Sellers and Purchaser shall use commercially reasonable efforts to have included in the Sale Order an authorization for Sellers to assume the Assumed Contracts and the Assumed Leases and assign to Purchaser all Assumed Contracts and Assumed Leases, and Purchaser shall be exclusively responsible for any Assumed Liabilities under all such Assumed Contracts and Assumed Leases, other than any Compromised Liabilities related to such Assumed Contracts and Assumed Leases, if any, after Purchaser's cure of all applicable monetary defaults in accordance with Section 7.7 below.

(*Id.* at 382-83) Section 7.7 of the APA, entitled "Cure of Defaults," further states:[3]

> Purchaser shall, at or prior to the Closing, cure any and all monetary defaults under the Assumed Contracts and Assumed Leases, which defaults are required to be cured under the Bankruptcy Code in the amounts set forth in Schedules 2.1(b)(ii) and 2.1(c), respectively, so that such Assumed Contracts and Assumed Leases may be assumed by Sellers and assigned to Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code. **Prior to the Closing, Purchaser, at its sole discretion, shall retain the right to refuse assignment of or otherwise reject any of the Assumed Contracts and Assumed Leases that may remain subject to rejection in the Chapter 11 Cases by providing Seller written notice thereof five days prior to Closing.** In the event that Purchaser shall determine to reject or refuse assignment of any such Assumed Contract or Assumed Lease prior to the Closing, Purchaser shall have no obligations with respect to such Assumed Contract or Assumed Lease, including any obligation to cure any defaults thereunder.

---

[2] Since debtors were the sellers in the APA, all references in the APA to "Sellers" refer to debtors. (D.I. 12 at 376) Likewise, since appellant was the purchaser in the APA, all references in the APA to "Purchaser" refer to appellant. (*Id.*)

[3] The CSA was among the contracts listed in Schedule 2.1(c). (*Id.* at 376-77)

(*Id.* at 377) (emphasis added)

4. On August 15, 2007, the bankruptcy court's Sale Order (the "Sale Order") was entered, which contained the following language:[4]

> The Debtors, Prevailing Bidder, and Allied resolved the Allied Objection as set forth herein. Any account payable incurred post-petition and in the ordinary course of business by the Debtors owing to Allied shall be paid when due by the Debtors or the Prevailing Bidder, as applicable, with the Debtors paying any such payable that becomes due on or before the Closing, and the Prevailing Bidder paying any such payable that becomes due after the Closing, in each case regardless of when such payable accrued or was incurred or invoiced.

(*Id.* at 378) The above language was agreed upon by Dura, Allied, and appellant, in resolution of a Limited Response filed by Allied. (*Id.*) Allied's Limited Response included the following three statements:

> 1. Allied did not oppose assumption by the proposed Purchaser (i.e., Atwood LLC) of the Debtors' Atwood Division;
> 2. Allied wanted to ensure that any amounts owing to it at the time of closing under the APA would be timely paid by the Debtors or the Purchaser; and
> 3. Allied sought confirmation that the Purchaser would assume and pay Atwood's post-petition ordinary course of business accounts payable arising at the time of closing.

(*Id.*)

5. On August 21, 2007, appellant asserts that it sent Dura a letter stating that appellant would not take assignment of certain contracts in the APA, including the CSA. (*Id.* at 378-79) Appellant did not send this letter to Allied.[5] (*Id.* at 379) Dura asserts

---

[4]All references in the Sale Order to the "Prevailing Bidder" refer to appellant. (*Id.* at 378)

[5]The bankruptcy court's opinion does not indicate whether the letter was sent to the bankruptcy court. (*Id.* at 379)

4

that it has no record of receiving this letter or an email containing the letter, which appellant claims to have sent. (*Id.*)

6. On August 27, 2007, Dura closed on its sale of the Old Atwood assets to appellant. (*Id.*) After the sale, appellant purchased goods from Allied in the same manner and at the same price as Dura had previously purchased the goods from Allied under the CSA. (*Id.*) In March of 2008, appellant stopped purchasing goods from Allied prior to the CSA's termination. (*Id.*)

7. On December 30, 2008, the bankruptcy court ruled on Allied's Clarification Motion by ordering that appellant was assigned the CSA pursuant to the terms of the APA, as approved by the Sale Order. (*Id.* at 385-86) On appeal to this court appellant brings two issues: (1) whether the bankruptcy court erred in ruling that the Sale Order and APA were not ambiguous; and (2) whether the bankruptcy court erred in ruling that the CSA between Allied and Dura was assigned to appellant pursuant to the terms of the Sale Order and APA. (D.I. 8 at 1)

8. **Analysis.** In Delaware, the interpretation of a contract is a matter of law for the court to determine.[6] *Rhone-Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). Clear and unambiguous language in a contract should be given its ordinary and usual meaning. *See Johnston v. Tally Ho, Inc.*, 303 A.2d 677, 679 (Del. Super. 1973). Absent some ambiguity, Delaware courts will not destroy or twist policy language under the guise of construing it. *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 926 (Del. 1982). "[W]hen the language

---

[6]Delaware law governs the APA. (*Id.* at 107)

of [a contract] is clear and unequivocal, a party will be bound by its plain meaning because creating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities and duties to which the parties had not assented." *Id.*

9. However, ambiguity exists when contractual provisions "are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc*, 616 A.2d at 1196. Inconsistent contractual provisions may create ambiguity in a contract. *See Franklin v. White Egret Condo., Inc.*, 358 So.2d 1084, 1087 (Fla. Dist. Ct. App. 1977) (finding "two sections [of a disputed contract] are inconsistent, and inherently ambiguous."), *aff'd*, 379 So. 2d 346 (Fla. 1979); *Weber v. Tillman*, 913 P.2d 84, 96 (Kan. 1996) ("To be ambiguous, a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language."); *Fraternal Order of Police v. City of Fairmont*, 468 S.E.2d 712, 716 (W. Va. 1996) ("Contract language usually is considered ambiguous where an agreement's terms are inconsistent on their face . . . ."). "The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Rhone-Poulenc*, 616 A.2d at 1196.

10. In the case at bar, the court concludes that the Sale Order and APA are ambiguous. The parties have presented plausible alternative interpretations of the Sale Order and APA, establishing that they are "reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc*, 616 A.2d at 1196. Appellant argues that the APA should be interpreted as giving appellant the

6

right to reject any of Dura's assumed contracts prior to closing. (D.I. 8 at 4) Section 7.7 of the APA states, "Prior to the Closing, [appellant], at its sole discretion, shall retain the right to refuse assignment of or otherwise reject any of the Assumed Contracts . . . that may remain subject to rejection in the Chapter 11 Cases . . . ." (D.I. 12 at 377) Based on the plain language of § 7.7, one reasonable interpretation of the APA is that appellant had the right to reject any of Dura's assumed contracts prior to the APA's closing, including the CSA.

11. However, Allied and Dura have presented an alternative reasonable interpretation of appellant's right of rejection under the APA. Allied and Dura argue that § 7.6 of the APA, which is entitled "Assignment of Contracts," governs all contracts which Dura had already assumed and were ready for assignment, such as the CSA. (D.I. 10 at 10; D.I. 11 at 16, 17) Section 7.6 of the APA states, "[Dura] and [appellant] shall . . . have included in the Sale Order an authorization for [Dura] to assume the Assumed Contracts . . . and assign to [appellant] all Assumed Contracts . . . and [appellant] shall be exclusively responsible for any Assumed Liabilities under all such Assumed Contracts . . . ." (D.I. 12 at 382-83) Based on the plain language of § 7.6, another reasonable interpretation of the APA is that appellant would be assigned all contracts that Dura had previously assumed prior to the APA's closing, including the CSA.

12. Further, Allied and Dura's interpretation of appellant's limited right of rejection is supported by the plain language of the Sale Order. In reference to accounts payable arising from the CSA, the Sale Order states that appellant, as the Prevailing

Bidder, would "pay[] any such payable that becomes due after the Closing . . . ." (*Id.* at 378) Dura, Allied, and appellant agreed upon this language in resolution of a Limited Response filed by Allied concerning accounts payable arising post-petition, but pre-closing. (*Id.*) Since the Sale Order states that appellant would be liable for all accounts payable arising from the CSA after the APA's closing, the Sale Order can be reasonably interpreted as implying that appellant would be assigned the CSA and, therefore, had no right to reject it.

13. Thus, the plain language of the Sale Order and APA give rise to different interpretations of appellants right to reject Dura's contracts prior to the APA's closing. Although § 7.7 of the APA states that appellant had the right to reject "any of [Dura's] Assumed Contracts," § 7.6 states that appellant would be "exclusively responsible for any Assumed Liabilities under all such Assumed Contracts . . . ." (*Id.* at 377, 382-83) The plain language of the Sale Order also implies that appellant had no right to reject the CSA, one of Dura's assumed contracts, because appellant would be responsible for all accounts payable arising from it after the APA's closing. (*Id.* at 378) Therefore, as a matter of law, the court concludes that the Sale Order and APA are ambiguous.

14. Having found the Sale Order and APA to be ambiguous, the court will defer to the bankruptcy court's interpretation "unless it is unreasonable under the circumstances." *Shenango*, 501 F.3d at 346. In the case at bar, the bankruptcy court interpreted its own Sale Order to conclude that the CSA had been assigned to appellant. Specifically, the bankruptcy court found that "[t]he language in the Sale Order relevant to the CSA - - representing an agreed resolution of Allied's Limited

Response - - unequivocally obligates the 'Prevailing Bidder,' here, Atwood LLC, as it turned out, to pay payables due after Closing." (D.I. 12 at 384) The bankruptcy court further stated that

> this language manifests a clear intent by the parties that the CSA, already assumed pre-sale by the Debtors, was to be assigned to the successful bidder for the Atwood Division assets, which turned out to be a party directly involved in adding this new language to the proposed Sale Order.

(*Id.*)

15. Further, the bankruptcy court interpreted the Sale Order as adopting Allied's interpretation of the APA. (*Id.*) The bankruptcy court read sections 7.6 and 7.7 of the APA together as requiring Dura to assume the executory contracts listed on Schedule 2.1(c) and assign them to appellant, subject to appellant's right to reject any executory contract not yet assumed by Dura. (*Id.* at 383) Under this interpretation, appellant's attempt to reject the CSA prior to the APA's closing failed, because Dura had previously assumed the CSA before appellant attempted to reject its assignment.

16. The court concludes that the bankruptcy court's interpretation of the Sale Order and APA is not unreasonable under the circumstances. Therefore, the bankruptcy court did not err in ruling that appellant was assigned the CSA pursuant to the terms of the Sale Order and APA.

17. **Conclusion.** For the reasons explained, the bankruptcy court's decision is affirmed, and the appeal therefrom is denied.

_____
United States District Judge